## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SCOTT T. OZAKI DDS INC. d/b/a EASTLAKE PERIODONTICS & IMPLANTS, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>HENRY SCHEIN, INC., PATTERSON COMPANIES, INC., and BENCO DENTAL SUPPLY COMPANY,<br><br>　　　　　　　Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 1 AND 3 OF THE SHERMAN ACT<br><br><br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff Scott T. Ozaki DDS Inc. d/b/a Eastlake Periodontics & Implants ("Plaintiff") brings this action on behalf of itself and all other similarly-situated entities who have purchased dental supplies directly from Defendants Henry Schein, Inc. ("Henry Schein"), Patterson Companies, Inc. ("Patterson"), and Benco Dental Supply Company ("Benco") (collectively, "Defendants") for Defendants' unlawful conspiracy to monopolize the dental supplies market in the United States through coercion and group boycotts in violation of sections 1 and 3 of the Sherman Act 15 U.S.C. §§1, 3. Plaintiff brings this action based on personal knowledge as to matters related to its purchases and interactions with Defendants and upon information and belief and investigation of counsel as to other matters.

## NATURE OF THE ACTION

1.　　　Defendants are the three major providers of dental supplies products and equipment in the United States. These three Defendants, who control more than 80% of the market, have engaged in an ongoing conspiracy to illegally harm would-be dental product competitors in order to allow Defendants to maintain and extend their dominant power in the market for the distribution of

dental supplies and equipment in the U.S.  Any successful entry of a new competitor into the dental supplies distribution market, and the resulting price discounts that would result from increased competition, would substantially threaten Defendants' collective market share, revenues, and profits. Defendants responded to the threat of new competitors by conspiring to boycott and threaten certain business associates of Defendants' competitors in order to prevent the successful entry of new competitors into the dental supplies distribution market.

2.      As detailed below, Defendants unlawfully abused their collective market power by, among other things, foreclosing competition in the dental supplies market through a concerted effort to exclude and/or impair competitors and potential competitors by: (i) engaging in a group boycott of competitor suppliers; and (ii) engaging in a group boycott of entities that did business or planned to do business with competitors.

3.      As a direct result of the anticompetitive scheme detailed herein, Defendants succeeded in increasing barriers to entry and blocking expansion of rival dental supply distribution entities.  This allowed Defendants to maintain and enhance their already dominant market power and allowed Defendants to continue charging artificially inflated prices to Plaintiff and other members of the proposed Class (as defined herein).  There are many thousands of similarly situated direct purchasers of dental supplies paying artificially inflated prices because of Defendants' unlawful anticompetitive conduct.

4.      As a result of the anticompetitive scheme, Defendants succeeded in increasing barriers to the entry and expansion of rival dental supplies distribution entities, thereby maintaining and enhancing their market power, and charging artificially inflated prices to Plaintiff and other members of the Class.

5.      The Texas Attorney General filed a complaint against one of the Defendants, Benco,

in April of 2015 (the "Texas AG Complaint"), which alleged, in part:

> …Benco and its competitor distributors engaged in ongoing communications over several months about [a new low-cost distributor]. They shared information about market players' reactions to the new firm's entry, they collectively developed a response, and they provided reassurances to market participants about the collective response....  Benco and its competitor distributors contacted other distributors and manufacturers to pressure those entities to discontinue any relationships that ultimately supplied [the new low-cost distributor]…. As a result of this pressure, other distributors and manufacturers discontinued such relationships, causing [the new low-cost distributor] to lose access to products.

6.      Defendant Benco subsequently settled the case with Texas, agreeing to a consent judgment where it was required to pay $300,000 and was further ordered to agree to certain relief, including ceasing the anticompetitive conduct alleged by the Texas Attorney General.

7.      Similarly, a private would-be competitor SourceOne Dental, Inc. ("SourceOne"), who developed a business model that posed a unique competitive threat to Defendants' hold on the market, filed suit against Defendants in this Court alleging that some of the same conduct alleged in this Complaint foreclosed and impaired its ability to compete effectively in the market for dental supplies and, as a direct result, Defendants have not had to reduce prices to compete on the merits with, and avoid losing market share to, SourceOne.

8.      The Federal Trade Commission and the Arizona Attorney General are also investigating Defendants' conduct.

9.      The private complaints and government investigations have not curtailed Defendants' anticompetitive conduct.  Moreover, Defendants continue to charge Plaintiff and other Class members prices above competitive levels for dental supplies.

10.      The anticompetitive conduct alleged herein constitutes an unreasonable restraint of trade in violation of sections 1 and 3 of the Sherman Act, 15 U.S.C. §§1, 3.  Defendants' conduct has had the purpose and effect of allowing Defendants to maintain and enhance their collective market

power and thereby to charge supracompetitive prices to Plaintiff and other members of the Class for dental supplies, and to otherwise cause harm to competition and consumers more generally.

## JURISDICTION AND VENUE

11.     The claims set forth in this Complaint arise under sections 1 and 3 of the Sherman Act (15 U.S.C. §§1, 3), and Plaintiff seeks treble damages pursuant to section 4 of the Clayton Act (15 U.S.C. §15(a)).   In addition, Plaintiff seeks injunctive relief pursuant to section 16 of the Clayton Act (15 U.S.C. §26).  This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§1331 and 1337(a).

12.     Venue is proper in this District because, pursuant to 15 U.S.C. §22 and 28 U.S.C. §1391(b), at least one defendant, Henry Schein, operates its principal place of business in this District; all of the Defendants are authorized to and do conduct business in this District; and a substantial portion of the activity alleged herein took place in this District.

13.     This Court has personal jurisdiction over each Defendant because each Defendant transacts business and is subject to personal jurisdiction within the Eastern District of New York. Each Defendant sells dental supplies to dental practices and laboratories located in the Eastern District of New York.

14.     At all relevant times, Defendants sold their products to dental practices located nationwide, operating in a continuous and uninterrupted flow of commerce across state lines and such commerce has substantially affected interstate commerce.  Accordingly, Defendants' conduct alleged herein has substantially affected interstate commerce.

## PARTIES

15.     Plaintiff is a periodontal practice located in Chula Vista, California.   During the Class Period (as defined herein), Plaintiff purchased dental supplies directly from defendants Henry Schein and Patterson, and was injured by paying inflated prices for dental supplies due to

- 4 -

Defendants' illegal conduct described herein.

16. Defendant Benco is a Delaware corporation with principal executive offices at 295 CenterPoint Boulevard, Pittston, Pennsylvania. Defendant Benco is a privately-held dental supply company that sells dental equipment such as imaging technology, chairs, lights, gloves, cabinetry, and associated maintenance services. Defendant Benco also operates a tooth fabrication facility that engineers and distributes false teeth to dental professionals. As of March 8, 2016, defendant Benco operates in all fifty states in the U.S., and is the third largest distributor of dental supplies and equipment in the nation.

17. Defendant Henry Schein is a Delaware corporation with principal executive offices at 135 Duryea Road, Melville, New York. Defendant Henry Schein is a publicly-offered medical supply company operating globally to distribute a variety of medical and veterinary products and services such as surgical devices, diagnostic tests, pharmaceuticals, vaccines, and vitamins. Defendant Henry Schein also operates a technology services group that distributes various software and network systems for dental, medical, and animal health clinics. As of December 26, 2015, defendant Henry Schein employed nearly 19,000 full time employees, of which 8,500 are based outside the United States.

18. Defendant Patterson is a Minnesota corporation with principle executive offices at 1031 Mendota Heights Road, St. Paul, Minnesota. Defendant Patterson is a publicly-offered dental and medical supply company that operates primarily in the United States and Canada, but also offers some veterinary services in the United Kingdom. Defendant Patterson's largest business segment, dental supply, provides consumable products such as x-ray film, hand instruments, sterilization products, and related services to a variety of customers including dentists, laboratories, and dental institutions. As of April 25, 2015, defendant Patterson employed 7,000 employees.

## CLASS ALLEGATIONS

19.     Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of itself and the following class (the "Class"):

> All persons or entities in the United States that directly purchased dental supplies and/or dental equipment directly from Henry Schein, Inc., Patterson Companies, Inc., and/or Benco Dental Supply Company at any time during the period from January 20, 2012 until the challenged conduct ceases ("Class Period").  Defendants Henry Schein, Inc., Patterson Companies, Inc., and/or Benco Dental Supply Company and their subsidiaries are not included in the Class.  Also excluded from the Class are federal and state entities that directly purchased dental supplies and/or dental equipment from one or more of the Defendants.

20.     Members of the Class are so numerous that joinder is impracticable.  The Class includes thousands of private dental practices and laboratories.

21.     There are numerous questions of law and fact common to the Class, including, without limitation:

(a)     Defendants' power in the market for distribution of dental products in the United States;

(b)     whether, through the conduct alleged in this Complaint, Defendants maintained and/or enhanced their collective market power;

(c)     whether Defendants conspired to engage in unlawful exclusionary conduct to impair the opportunities of rivals in the market for distribution of dental supplies in the United States;

(d)     whether Defendants agreed to illegally boycott one or more competitors;

(e)     whether Defendants did in fact illegally boycott one or more competitors;

(f)     whether Defendants agreed to illegally boycott and/or threaten to boycott state dental associations that did business with or planned to do business with or recommend competitors' services to their member dentists;

(g)     whether Defendants did in fact illegally boycott and/or threaten to boycott state dental associations that did business with or planned to do business with or recommend competitors' services to their member dentists;

(h)     whether Defendants agreed to illegally boycott and/or threaten to boycott manufacturers of dental supplies as a means to deter or stop manufacturers from doing business with rival distributors of dental supplies;

(i)      whether Defendants did in fact agree to illegally boycott or threaten to boycott dental supplies manufacturers;

(j)      whether Defendants entered into exclusionary agreements that unreasonably restrained trade and impaired competition;

(k)     whether the conduct as alleged in this Complaint constitutes a *per se* illegal violation of the antitrust laws; and

(l)      whether, and to what extent, Defendants' conduct caused purchasers, including Plaintiff to pay supracompetitive prices for dental supplies and thereby to suffer antitrust injuries.

22.     These and other common questions of law and fact predominate over any questions affecting only individual Class members.

23.     Plaintiff's claims are typical.  All Class members suffered antitrust injury in the same way as a result of Defendants' wrongdoing.  The claims alleged by each Class member arise out of the same central facts and are based upon the same legal theories.

24.     Plaintiff will adequately and fairly represent the Class and will properly protect the interests of all Class members.  There are no conflicts between Plaintiff and other members of the Class.

25.     Plaintiff has retained counsel experienced in class action antitrust litigation.

26.     A class action here is superior to any other method for the fair and efficient adjudication of this controversy.   There are no management issues that make a class action unreasonably difficult here.   In fact, a class action is the most efficient means by which this controversy should be decided.

## SUBSTANTIVE ALLEGATIONS

27.     Defendants are the three main providers of dental supplies in the United States. These products include, but are not limited to, x-ray film, restoration materials, hand instruments, sterilization products, cements and liners, crown and bridge products, endodontics, implants, impression materials, instruments, pins and posts, retraction materials, rubber dam materials, and waxes as well as infection control products.   The market also includes equipment such as office equipment, including dental chairs and computer-aided design and manufacturing systems. Together, Defendants control about 80% of all dental supplies sales.

28.     While there are many dental supplies manufacturers, none on their own offer the full range of supplies needed to run a dental practice.   Suppliers and manufacturers sell their products either directly to dentists or to wholesale distributors such as Defendants.   Those wholesale distributors in turn resell to dentists at a profit.   Because dental practitioners require many different supplies from many different manufacturers, direct sales are fairly uncommon.   Rather, dental practitioners generally purchase dental supplies from distributors offering a wide range of products such as Defendants.   Buying from Defendants gives dentists the ability to one-stop shop, a convenience for which Defendants have traditionally charged a premium.

29.     The higher prices charged by Defendants have meant that if competitors were able to offer similar one-stop services at a lower price, they should have been able to thrive.   In order for an entity to enter the distributor market and successfully sell dental supplies to dental practitioners in the United States, however, several key elements are required.   For example, the distributor must be

able to buy and stock the large quantity and variety of supplies necessary to achieve economies of scale that allow for competitive prices with Defendants' prices, and new distributors must be able to efficiently reach large numbers of dental practices, laboratories, and dental supplies purchasers.

30.     One way to lower barriers to entry and connect with dental practitioners is through state dental associations.  These voluntary associations of dentists possess an important ability to connect dentists with distributors by endorsing or partnering with the distributor.  For years, entities interested in entering the market have tried to work with state dental associations.  As detailed herein, however, new market entrants have been mostly unsuccessful because of Defendants' unlawful coordinated boycotts.

31.     Defendants' anticompetitive conduct and agreements constitute a horizontal group boycott that is a *per se* violation of sections 1 and 3 of the Sherman Act.  Thus, a relevant market need not be defined.

32.     Alternatively, if the Court determines that Plaintiff's Sherman Act claim cannot proceed under a *per se* theory, Defendants' anticompetitive conduct and agreements constitute a violation of the Sherman Act under the "rule of reason."  In this case, the relevant market, limited geographically to the United States, is the market for distributing and selling a wide range of dental supplies, including offering direct purchasers the convenience of one-stop shopping.

**The Dental Supplies Market**

33.     In order to run a dental practice or laboratory, a wide variety of supplies are used and consumed and a significant percentage of a dental practices' income is spent purchasing supplies. The market for dental supplies in the United States is massive.  According to SourceOne, the market generates approximately $10 billion in annual revenue from over 120,000 private dental practices, with each purchasing on average more than $80,000 worth of supplies and equipment annually. The cost of consumable dental supplies is a substantial component of the revenues of private dental

practices.  In fact, most dentists use between 5% and 7% of their annual revenue to purchase supplies used in the daily operations of their practice, or nearly 28% of their average net income.

34.     A significant majority of dental supplies are sold by manufacturers to intermediate distributors such as Defendants, who then resell those products to dental practices and laboratories. Because dental practices and laboratories require many different supplies from many different manufacturers, they generally opt to purchase dental supplies from distributors that offer a wide range of products from many different manufacturers, instead of placing individual orders from dozens of different manufacturers.  Dental supplies distributors, such as Defendants, carry comprehensive ranges of products from different manufacturers that allow customers to "one-stop shop" for dental supplies.  Distributors charge for that service.

35.     Because of this business model, additional distributors have sought ways to enter the market by being more efficient, earning lower margins, or both.  For example, certain distributers have used state dental associations as group purchasing organizations ("GPOs"), which allowed for coordination of dentists and manufacturers of dental supplies and equipment on a single platform. GPOs therefore help healthcare providers (such as dental practitioners, hospitals, and nursing homes) realize savings and efficiencies by aggregating purchasing volume and potentially using that leverage to negotiate discounts with manufacturers, distributors, and other vendors.

36.     The rise of GPOs has threatened Defendants' business, including its supracompetitive pricing.  Indeed, as stated by defendant Henry Schein in its recent Annual Report on Form 10-K filed with on February 10, 2016, with the U.S. Securities and Exchange Commission, the expansion of GPOs could place it "at a competitive disadvantage" by shifting purchasing decisions to various entities with which it had no historical relationship.  The Form 10-K further notes that this shift could "threaten [Henry Schein's] ability to compete effectively, which could in turn negatively affect

[its] financial results."

**Defendants' Anticompetitive Conduct**

37.     Traditional supply distributors, such as Defendants, enjoy close relationships with each other, both personally and professionally.  In fact, as detailed in the Texas AG Complaint, many of the Defendants' higher-level employees have previous employment relationships within the various Defendant companies and regularly interact using difficult-to-track and difficult-to-trace communications such as in-person meetings and via telephone.  These close relationships and secretive communications allowed Defendants to reach an agreement on a collective response to the threat posed by SourceOne and other new competitors.

38.     In or about 2013, SourceOne secured the agreement of its vendors to offer progressively lower prices to the state associations' members as a function of increasing transaction volume.  At that time, SourceOne created the dental supplies and equipment GPO that had long been desired by dentists and feared by Defendants.  Thereafter, in part due to the endorsement of state dental associations, SourceOne's platform became progressively more attractive to manufacturers of dental supplies and equipment.  As a result, manufacturers agreed to participate in increasing numbers, which in turn made the platform more attractive to dentists and state dental associations. In other words, SourceOne was legally and competitively luring business away from Defendants.

39.     In response to rising competition from companies such as SourceOne, Defendants agreed to enact a plan to stifle these competitors through unlawful threats and boycotts of the entities that cooperated with such competitors.  Defendants, through their concerted efforts, thereafter began pressuring manufacturers and distributors to discontinue supplying dental supplies to SourceOne and its GPO platform, and further threatened to cease stocking or promoting products from manufacturers who allowed their products to be sold through SourceOne.  Defendants also agreed to pressure state dental associations to cease and/or refrain from engaging in business with

competitors and then boycotted any events where the hosts had engaged or planned to engage in business with SourceOne, including trade shows and state dental association meetings.

40.     Defendants' unlawful actions proved wildly effective.  Thousands of dentists, and numerous state dental associations, dental supplies and equipment manufacturers, and dental supplies and equipment distributors stopped dealing with SourceOne.  In fact, according to SourceOne, several of its suppliers specifically informed the company that they were discontinuing or severely diminishing sales to SourceOne and its GPO platform as a direct result of pressure from Defendants.  As a result of Defendants unlawful scheme, by April 2014, SourceOne lost access to at least 75% of its top selling products.  The same month, the two largest distributors to SourceOne informed the company that they were discontinuing all business with it, and one of those suppliers specifically stated that the termination was the result of pressure applied by Defendants.

41.     Importantly, nearly all of the distributors and manufacturers that stopped supporting SourceOne and its GPO platform did so between October 2013 and April 2014.  The collective timing strongly supports an inference of collusion and signals the success of Defendants' threatened boycotts.  Further supporting an inference of collusion, many of the distributors and manufacturers that ended their business relationships with SourceOne during this time were and are heavily reliant on Defendants for distribution of their products.  In stark contrast, the distributors and manufacturers that typically sold directly to dentists (thereby bypassing Defendants' distribution grasp) mostly continued to support and supply SourceOne.

42.     At the same time that Defendants were successfully pressuring manufacturers and distributors to cease doing business with its competitors, they also began threatening and boycotting state dental associations that endorsed or partnered with such competitors.  For example, Defendants threatened to boycott trade shows and annual meetings of the state dental associations that either did

- 12 -

business with SourceOne or showed interest in doing business with SourceOne.  Defendants also pressured dental supplies manufacturers and distributors to join these trade show and annual meeting boycotts.  As detailed below, on the rare occasion that dental associations refused to kowtow to Defendants' threats, Defendants in fact followed through with their boycott plans.

43.     In late 2013, SourceOne launched TDA Perks Supplies, an online sales platform and GPO for the dental professional members of the Texas Dental Association ("TDA").  Between April 30, 2014 and May 3, 2014, the TDA held an annual meeting and trade show.  The event was uniformly boycotted by Defendants, who were the only dental supplies distributors that did not attend this event.  The event was also boycotted by dozens of dental supplies and equipment manufacturers that did business with Defendants.  Defendants and the dental supplies and equipment manufacturers all opted-out at the last minute, after TDA ultimately refused to stop supporting SourceOne.  This suspicious and historically unprecedented no-show was not announced publicly by Defendants in advance.

44.     In a competitive market, a single distributor's unilateral boycott of a state dental association annual meeting or trade show would contravene that distributor's self-interest.  Sending sales representatives to trade shows allows a distributor to promote its brand and market its services to thousands of state dental association members.  This is especially true where Defendants' business model relies on sales representatives.  In many cases, distributors that withdrew from trade shows to boycott a dental association lost significant security deposits.  Thus, had Defendants not been acting as a part of a conspiracy, it would have made no economic sense for any individual Defendant to have unilaterally boycotted state dental association trade shows.

45.     Although the boycott harmed Defendants as a result of the potential loss of substantial revenues and forfeiture of significant deposits already paid, it successfully sent

- 13 -

Defendants' coercive message to other state dental associations across the country.  As a result, and given that Defendants account for more than 80% of the dental supplies distribution market, many other state associations that had previously expressed interest in promoting SourceOne's GPO platform to their members completely changed their tunes and declined further support of SourceOne and presumably other competitors to Defendants.

46.     Despite Defendants' largely successful threats, however, one state dental association known as the Arizona Dental Association ("AZDA") did commence a business relationship with SourceOne after the TDA boycott.  As with TDA, Defendants retaliated against AZDA by boycotting its annual meeting and trade show in March 2015.  Also, like with TDA, Defendants were the only distributors that did not show up to AZDA.  Unsurprisingly, it appears that AZDA has learned Defendants' harsh and punitive lesson, and has since ceased to actively promote SourceOne's GPO platform to its members.

47.     In light of the TDA and AZDA boycotts and the respective harm caused to those organizations, other state organizations almost uniformly bowed to Defendants' pressures and ceased doing business with SourceOne in order to avoid the greater losses they would face from the boycotts.  In fact, according to SourceOne, some of these dozens of organizations specifically informed SourceOne that they were afraid to support it because they were concerned about similar boycotts.

48.     As noted above, the actions of Defendants led to a complaint being filed by the Texas Attorney General against defendant Benco in April 2015.  The Texas AG Complaint alleges that defendant Benco and others "shared information about market players' reactions to the new firm's entry, they collectively developed a response, and they provided reassurances to market participants about the collective response."  The Texas AG Complaint further alleges that

defendant Benco and others then took action to boycott an online sales platform launched by the TDA in partnership with SourceOne. Defendant Benco entered into an agreed final judgment on the same day the Texas AG Complaint was filed. As part of the agreement, defendant Benco agreed to pay $300,000, and also agreed to a number of other aspects of relief, some of which appear contrary to the company's denial of wrongdoing.

49. The Arizona Attorney General and the Federal Trade Commission have also commenced investigations of Defendants with respect to similar claims. In 2014, the Arizona Attorney General initiated its investigation of defendant Benco and other yet-unknown dental supplies distributors for anticompetitive conduct in violation of Arizona law. In October 2014, the Arizona Attorney General issued Civil Investigative Demands ("CIDs") requiring defendant Benco to produce documents and electronic materials relating to the investigation, and defendant Benco produced documents in response to the CIDs. That investigation is believed to be ongoing.

**Manufacturers Were Forced to Cooperate with Defendants' Scheme**

50. Many dental supplies manufacturers make substantial portions of their total sales through Defendants. These manufacturers substantially rely on Defendants to market and resell their products to dental practices and laboratories. If Defendants were to stop selling products from one of these manufacturers, or if Defendants were to reduce their efforts to sell a manufacturer's products, that manufacturer would suffer significant financial losses.

51. Defendants conspired to collectively pressure and threaten manufacturers and other distributors to discontinue and refrain from supplying new lower-priced distributors with dental supplies. In furtherance of this conspiracy, Defendants threatened that if manufacturers did business with new lower-priced distributors, Defendants would not sell or would not actively promote the manufacturers' products.

52.     Because Defendants control the market for dental supplies, threats from Defendants were successful in coercing manufacturers to cease doing business with SourceOne and with other would-be entrants in the market.

**Defendants Have Engaged in Anticompetitive Conduct for Many Years**

53.     Defendants' anticompetitive conduct has been ongoing for several years.  For example, in 2012, Archer and White Sales, Inc. ("Archer"), a lower-priced distributor of dental supplies, filed an antitrust case claiming that certain of the Defendants engaged in anticompetitive conduct including:

- conspiring to thwart Archer's growth in certain parts of the country;

- engaging in a price-fixing conspiracy by agreeing not to competitively bid against horizontal competitors;

- obstructing Archer's membership in the American Dental Cooperative, an organization created to help smaller companies compete against large national dental supplies distributors; and

- coordinating boycotts against Archer by threatening to stop buying equipment from certain suppliers and to stop selling equipment from certain manufacturers.

**The Dental Supply Market Is Susceptible to Anticompetitive Conduct**

54.     The market for the distribution of dental supplies exhibits a number of characteristics that increase its susceptibility to anticompetitive conspiracy among distributors. Indeed, the market is highly concentrated, has daunting barriers to entry, and is heavily reliant on endorsements and support from a handful of associations.  These factors, as detailed below, all indicate the potential for successful collusion among dental supplies distributors.

55.     As an initial matter, the market is extremely concentrated and has only become more concentrated in the past few years.  Together, Defendants account for more than 80% of the dental supply distribution market.  It is axiomatic that the more concentrated a market is, the easier it is for those within the market to coordinate behavior and the more difficult it becomes for direct purchasers to avoid the negative effects of the collusive behavior.

56.     There are also high barriers to entry into this market.  As detailed above, acquiring relationships with manufacturers, acquiring relationships with dentists, and affording the economies of scale to be economically competitive make the market very difficult to enter.  To make matters worse, many of these high barriers can be traced directly to Defendants' anticompetitive conduct as they have threatened and successfully implemented group boycotts to muscle out the competition.

57.     Defendants, with their 80% market share, wield substantial power over the manufacturers, and manufacturers are particularly reliant upon Defendants.  Further, support from state dental associations is massively important to the success of new distributors, and the market power they collect.  These factors make the market extremely vulnerable to Defendants' group boycotts of manufacturers and state dental associations, thus significantly raising the barriers of entry and increasing as well as the market's susceptibility to a coordinated effort among the largest suppliers in the industry to maintain supracompetitive prices.

**Competition Has Been Harmed Because of the Defendants' Conspiracy**

58.     The anticompetitive conduct described in this Complaint maintained and increased Defendants' collective market power, allowing Defendants to maintain prices above competitive levels, to the detriment of Plaintiff and other members of the Class.  This harm to Plaintiff and other Class members, in the form of paying artificially inflated prices for dental supplies, constitutes cognizable antitrust injury and harm to competition under the antitrust laws.

59.     To the extent relevant, the anticompetitive actions alleged in this Complaint had other competitive harms as well.  As a result of the successful boycotts of new entrants, other potential competitors were discouraged from partnering with manufacturers and/or state dental associations to compete with Defendants.

60.     In addition to the artificially inflated prices charged to Plaintiff and the Class by Defendants, there were other anticompetitive effects that resulted from the conspiracy including reduced competition in the dental supply distribution market, a lack of innovation in the dental supply distribution market, reduced consumer choice, and harm to consumer welfare.

61.     Although the demand for dental supplies is relatively constant, the list prices charged since 2005 by defendants Henry Schein and Patterson have increased every year, even in the face of the 2009 economic recession that caused demand for dental supplies to fall by more than 2%.  In a competitive market, firms faced with static or declining demand conditions will attempt to increase sales by decreasing prices to take market share from competitors, but that has not occurred in this market.  For example, defendant Patterson's profit margins reached as high as 11% in 2010 and 2011.  In stark contrast, major pharmaceutical distributors typically see profit margins of between 0.2% and 1.5%.

62.     There are no procompetitive justifications for the conduct alleged in this Complaint.  Even if such justifications were forthcoming, there exist less restrictive means by which any purported procompetitive justification could have been achieved.  To the extent that Defendants' anticompetitive conduct or any aspect of their conspiracy has any cognizable procompetitive effects, they are substantially outweighed by the anticompetitive effects.

**Plaintiff Has Suffered Antitrust Injury**

63.     During the Class Period, Plaintiff and members of the Class purchased dental supplies from Defendants.  As a result of Defendants' anticompetitive conduct alleged herein, members of the

Class paid Defendants' prices for dental supplies that were inflated above competitive levels during and throughout the Class Period.

64.　　If new low-cost distributors had not been unlawfully prevented from partnering with state dental associations and dental supplies manufacturers, they would have emerged as major competitors to Defendants, resulting in greater competition and substantially lower prices for dental supplies, and Plaintiffs and the members of the Class would have paid substantially less for dental supplies during and throughout the Class Period.

65.　　If Defendants had not unlawfully conspired to prevent new low-cost distributors from partnering with state dental associations and dental supplies manufacturers as had been planned, other competitors would have partnered with state dental associations and manufacturers and emerged as viable nationwide competitors to Defendants, resulting in increased competition and substantially lower prices for dental supplies, and Plaintiff and the members of the Class would have paid substantially less for dental supplies as a result during and throughout the Class Period.

66.　　Because Defendants were successful in unlawfully preventing new low-cost distributors and other competitors from partnering with state dental associations and dental supplies manufacturers to compete with Defendants, competition in the market was substantially harmed, and Plaintiff and members of the Class have sustained, and continue to sustain, substantial losses in the form of artificially inflated prices paid to Defendants.  The full amount of such damages will be calculated after discovery and upon proof at trial.

67.　　Injury to Plaintiff and members of the Class was a direct and foreseeable result of Defendants' anticompetitive conduct.   Defendants' group boycotts foreclosed new entrant competitors, thereby suppressing competition, enhancing market power, and allowing Defendants to charge artificially inflated prices to dental practices and laboratories for dental supplies.

- 19 -

Although the mechanism of antitrust injury to Plaintiff and to competitors is the same, the damages caused to Plaintiff and other members of the Class in the form of artificially inflated higher prices is distinct from, and not duplicative of, the damages caused to competitors in the form of lost profits and business opportunities.

68.     Defendants' anticompetitive conduct is continuing, and so are the overcharges suffered by Plaintiff and the Class caused by Defendants' conduct.

## COUNT I

### Against Defendants for Violation of Sections 1 and 3 of the Sherman Act

69.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

70.     As set forth above, in violation of sections 1 and 3 of the Sherman Act, Defendants entered into agreements with one another to boycott and threaten to boycott state dental associations, dental supplies distributors, and dental supplies manufacturers that were doing business or considering doing business with new low-cost distributors and other competitors.

71.     This conspiracy was an unlawful group boycott, or in the alternative, was an unlawful restraint under the rule of reason.

72.     Each Defendant has committed at least one overt act—such as boycotting entities that did business with new low-cost distributors—to further the conspiracy alleged herein.

73.     Plaintiff and members of the Class have been injured in their business or property by Defendants' antitrust violations.  The injury to Plaintiff and the Class consists of paying prices for dental supplies inflated above competitive levels.  Such injury, in the form of overcharges, is of the type that antitrust laws were designed to prevent, and flows directly from Defendants' unlawful conduct.

- 20 -

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment on its behalf and on behalf of the Class herein, adjudging and decreeing that:

A.      This action may proceed as a class action, with Plaintiff as the designated Class representative and its counsel as Class Counsel;

B.      Defendants have engaged in combination and conspiracy in violation of sections 1 and 3 of the Sherman Act (15 U.S.C. §§1, 3), and Plaintiff and the members of the Class have been injured in their business and property as a result of Defendants' violation;

C.      Plaintiff and the members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount to be trebled in accordance with section 4 of the Clayton Act;

D.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and their respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

E.      Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

F.      Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' and experts' fees as provided by law;

G.      Plaintiff and members of the Class receive such other or further relief as may be just and proper; and

H.      That this Court award all such other and further relief as it may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues so triable.

Dated: March 17, 2016          LAW OFFICES OF THOMAS G. AMON
THOMAS G. AMON
PETER B. PATTERSON, JR.


/s/Thomas G. Amon
THOMAS G. AMON

156 West 56th Street, Suite 1102
New York, NY 10019
Telephone: (212) 810-2430
Facsimile:  (212) 810-2427
E-mail: tamon@amonlaw.com
        ppatterson@amonlaw.com

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
GEORGE C. AGUILAR
LEONID KANDINOV
600 B. Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
        gaguilar@robbinsarroyo.com
        lkandinov@robbinsarroyo.com

ROBBINS GELLER RUDMAN
& DOWD LLP
PATRICK J. COUGHLIN
DAVID W. MITCHELL
ALEXANDRA S. BERNAY
CARMEN A. MEDICI
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: (619) 231-1058
Facsimile: (619) 231-7423
E-mail: patc@rgrdlaw.com
        davidm@rgrdlaw.com
        xanb@rgrdlaw.com
        cmedici@rgrdlaw.com

ROBBINS GELLER RUDMAN & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: (631) 367-7100
Facsimile: (631) 367-1173
E-mail: srudman@rgrdlaw.com

Attorneys for Plaintiff

1086239