# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **ARCHER AND WHITE SALES, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **HENRY SCHEIN, INC., DANAHER** | § | |
| **CORPORATION, INSTRUMENTARIUM** | § | **CIVIL ACTION NO. _____** |
| **DENTAL INC., DENTAL EQUIPMENT** | § | |
| **LLC, KAVO DENTAL TECHNOLOGIES,** | § | |
| **LLC AND DENTAL IMAGING** | § | |
| **TECHNOLOGIES, CORPORATION,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## COMPLAINT

Plaintiff Archer and White Sales, Inc. ("Archer Dental") files this action against Defendants Henry Schein, Inc. ("Schein"), Danaher Corporation ("Danaher"), Instrumentarium Dental Inc. ("Instrumentarium"), Dental Equipment LLC d/b/a Pelton & Crane ("Pelton & Crane"), Dental Equipment LLC d/b/a Marus ("Marus"), Dental Equipment LLC d/b/a DCI Equipment ("DCIE"), KaVo Dental Technologies, LLC ("KaVo") and Dental Imaging Technologies, Corporation d/b/a Gendex Corp. ("Gendex"), (collectively, "Defendants"). Archer Dental seeks treble damages and injunctive relief for violations by all Defendants of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Texas Free Enterprise and Antitrust Act, TEX. BUS. & COMM. CODE, § 15.01.

## NATURE OF THE CASE

1.     This is an antitrust case arising out of the combination and conspiracy by Schein and Company X (not named as a defendant in this complaint), who are horizontal competitors in the distribution of dental equipment, to fix prices and refuse to compete with each other on the sales of dental equipment to dental professionals and their further agreement with each other to

force their common supplier Danaher and its various subsidiaries (collectively, "Danaher") to terminate and/or reduce the distribution territory of their price-cutting competing distributor Archer Dental. This termination was an illegal boycott, the purpose of which was to allow Schein and Company X to maintain and perpetuate their price-fixing agreement and their agreement not to compete on the sales of dental equipment. Danaher, as a common supplier of dental equipment to Schein, Company X and Archer Dental, facilitated the reduction in competition to increase prices by knowingly participating in the illegal boycott. Danaher knowingly participated in the illegal boycott to insure that Schein, a large and dominant distributor of Danaher dental equipment, and Company X, a significant distributor of Danaher dental equipment, would continue to sell and promote Danaher dental equipment. Danaher prohibited Archer Dental from selling dental equipment in areas and to customers which the distribution agreements between Archer Dental and Danaher or its predecessors permitted Archer Dental to sell, and it denied Archer Dental the discount structure to which Archer Dental was entitled based on its sales. Although the full extent of Archer Dental's damages caused by Defendants are not fully known at this time, they are estimated to be in the tens of millions of dollars.

2.      Defendants and Company X have carried out their conspiracy through a series of unlawful activities, including, but not limited to agreements not to compete, agreements to fix prices, and boycotts. Defendants' and Company X's conspiracy is continuing and they have committed acts in furtherance of that conspiracy in the four years preceding the filing of this complaint.

3.      Defendants' and Company X's conspiracy enables them to enjoy the economic benefits that flow from conspiring to operate an unlawful cartel that refuses to compete for the

sale of dental equipment, forecloses competition by others in the sale of dental equipment and fixes prices for dental equipment purchased by dental professionals throughout the United States.

## JURISDICTION, VENUE AND INTERSTATE COMMERCE

4.     This action is brought under Section 1 of the Sherman Act, 15 U.S.C. § 1 and the Texas Free Enterprise and Antitrust Act, TEX. BUS. & COMM. CODE, § 15.05.

5.     This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1337, and 15 U.S.C. §§ 15 and 26.

6.     This Court has personal jurisdiction over Defendants because each of them systematically and continuously transacts substantial business in the United States and in Texas and in the Eastern District of Texas.

7.     Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391 because Defendants inhabit, transact business, reside, are found to have an agent in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District.

8.     Defendants Danaher, KaVo, Instrumentarium, Gendex, Pelton & Crane, Marus and DCIE sell dental equipment across state lines.  Defendant Schein markets and sells dental equipment across state lines.  All Defendants receive substantial payments across state lines from the sale of dental equipment.  Defendants' business activities that are the subject of this Complaint are within the flow of, and substantially have affected, interstate trade and commerce.

## PARTIES

### Plaintiff

9.     Plaintiff Archer Dental is located at 1107 Summit Avenue, Suite 1, in Plano, Collin County, Texas, in the Eastern District of Texas.  Archer Dental is a family-owned business and has been in the business of distribution, sales and service of dental equipment and supplies to dental professionals since 1983.

## Defendants

10.     Defendant Danaher is a for-profit corporation organized and existing under the laws of the State of Delaware with its principal place of business at 2200 Pennsylvania Avenue, NW, Suite 800W, Washington, DC 20037.  Defendant Danaher may be served with process by serving its Registered Agent, Corporation Service Company, 2711 Centerville Rd., Suite 400, Wilmington, DE 19808.  On information and belief, Danaher is the largest manufacturer of dental equipment in the United States.  Danaher primarily sells and distributes its dental equipment through distributors such as Schein, Company X and Archer Dental.

11.     Defendant Instrumentarium is a for-profit corporation organized and existing under the laws of the State of Wisconsin with its principal place of business at 1245 W. Canal St., Milwaukee, Wisconsin 53233.  Defendant Instrumentarium may be served with process by serving its Registered Agent, CT Corporation System. 8040 Excelsior Drive, Suite 200, Madison, WI 53717.  On information and belief, Instrumentarium is a wholly-owned subsidiary of Danaher.  Instrumentarium primarily sells and distributes its dental equipment through distributors such as Schein, Company X and Archer Dental.

12.     Defendant Dental Equipment LLC does business under the names Pelton & Crane Marus and DCI Equipment.  Dental Equipment LLC is a for-profit corporation organized and existing under the laws of the State of North Carolina with its principal place of business at 11727 Fruehauf Drive, Charlotte, North Carolina  28273.  Defendant Dental Equipment LLC may be served with process by serving its Registered Agent, CT Corporation System, 150 Fayetteville St., Box 1011, Raleigh, NC 27601.  On information and belief, Dental Equipment LLC is a wholly-owned subsidiary of Danaher.  Dental Equipment LLC primarily sells and distributes its dental equipment through distributors such as Schein, Company X and Archer Dental.

4

13.     Defendant KaVo is a for-profit corporation organized and existing under the laws of the State of North Carolina with its principal place of business at 1340 East Main Street, Lake Zurich, Illinois 60047.  Defendant KaVo may be served with process by serving its Registered Agent, Secretary of State, 2 South Salisbury Street, Raleigh, NC 27601.  On information and belief, KaVo is a wholly-owned subsidiary of Danaher.  KaVo primarily sells and distributes its dental equipment through distributors such as Schein, Company X and Archer Dental.

14.     Defendant Gendex is a for-profit corporation organized and existing under the laws of the State of Pennsylvania with its principal place of business at 1910 N. Penn Road, Hatfield, Pennsylvania 19440.  Defendant Gendex may be served with process by serving its Registered Agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.   On information and belief, Gendex is a wholly-owned subsidiary of Danaher.  Gendex primarily sells and distributes its dental equipment through distributors such as Schein, Company X and Archer Dental.

15.     Defendant Schein is a for-profit corporation organized and existing under the laws of the State of Delaware with its principal place of business at 135 Duryea Road, Melville, New York 11747.  Defendant Schein may be served with process by serving its Registered Agent, Department of State, New York City Location, 123 William Street, New York, NY 10038-3804. On information and belief, Schein is the largest distributor of dental equipment in the United States.  Schein's overall net sales in 2011 were a record $8.5 billion.  Schein's dental sales constitute over one-third of its total net sales.

16.     Company X is not sued in the complaint.  It is a real company and is a significant participant in the business of sales and service of dental equipment and supplies in the United States.   Neither its real name nor the real name of its manager is used in this complaint.

Defendants are aware of the participants to the communications and conduct described in this complaint.

17.     Schein and Company X distribute many of the same lines of dental equipment in the same geographic areas and are therefore horizontal "competitors," but as described below, they have secretly agreed not to compete.

18.     The acts charged in this Complaint as having been done by Defendants and Company X were authorized, ordered, and/or done by their officers, agents, employees, and/or representatives, while actively engaged in the management of their business and affairs.

## **BACKGROUND**

19.     In 1963, James Archer, Sr. began working in the dental equipment sales and service industry as the college representative at Baylor Dental School in Dallas, Texas.  After college, he worked for several companies in the dental business over the years.

20.     In 1983, James Archer, Sr. started a dental equipment sales and service business which became Archer and White Sales, Inc. in Plano, Collin County, Texas.  Archer Dental's primary customers are dentists.  Mr. Archer was a pioneer of the discount full service dental equipment supplier business.  Mr. Archer's son, James Jr., started working in the family business when he was only 12 years old by repairing dental hand pieces.  James Archer, Jr. took the company into national sales distribution of dental equipment in 1993 through catalog and later internet sales.  James Archer, Jr. is now the President of Archer Dental.

21.     Prior to 2004, there were a number of dental equipment manufacturers in the U.S., and Archer Dental was an authorized distributor for multiple manufacturers, including Gendex, Kavo, Pelton & Crane, Marus, Kerr, DCI and others.  Beginning in or around 2004, Danaher embarked on a plan to consolidate the dental equipment manufacturing industry.  Danaher has become the largest manufacturer of dental equipment, in part, by acquiring multiple smaller

manufacturers of dental equipment over the years. For example, in 2004, Danaher acquired the Kavo and Gendex dental equipment businesses. In 2005, Danaher acquired the Pelton & Crane, Marus and DCI dental equipment businesses. In 2009, Danaher acquired PaloDEx Group, the owner of the Instrumentarium line of equipment. On information and belief, Danaher controls and directs the business activities of the dental equipment companies it has acquired and that are identified herein. Given that it owns and now controls a substantial portion of the dental equipment manufacturing industry, doing business with Danaher is essential to the economic success of dental equipment distributors such as Archer Dental. Certain Danaher brands have unique features and capabilities and are accepted by dentists in ways that other brands are not. The ability to distribute Danaher dental equipment brands is necessary for Archer Dental to compete effectively in the industry with Schein and Company X.

22. Archer Dental became known nationally among dental professionals (who purchase and use dental equipment) for its low prices and high-quality service. Archer Dental's sales always grew significantly when it gained distribution rights to an equipment line or a new distribution territory. That growth, however, would eventually draw the attention and later the action of its competitors who disliked Archer Dental's lower prices. As Archer Dental would learn later, it also became nationally known and disliked by competing dealers because of its low prices. What Archer Dental would not know for some time was the illegal lengths to which its competitors would go to shut down Archer Dental so that those competitors could maintain artificially high prices.

### The Conspiracy to Thwart Archer Dental's
### Growth in Oklahoma and Northwest Arkansas

23. Archer Dental's authorized distribution territory in its dealer agreements with Danaher allowed it to sell equipment in Texas and parts of Oklahoma and Northwest Arkansas. In addition to its strong Texas sales, Archer Dental's sales of equipment into Oklahoma and

7

Northwest Arkansas were strong. In 2004, Archer Dental explored the possibility of partnering with a company that already had a physical location in Oklahoma to further expand its sales in Oklahoma and Northwest Arkansas. When Company X's Dental manager in Oklahoma, (identified as XGM for purposes of this complaint), learned of Archer Dental's possible expansion plans, he called James Archer, Sr. and begged him not to enter into Oklahoma in a bigger way. Little did Archer Dental know at the time, but XGM's phone call was far more than just one old friend making a plea to another; XGM's call was part of a broader conspiracy to stifle competition in the dental equipment business.

24.     In July 2004, Archer Dental entered into a business arrangement with Oklahoma-based dental distributor Dynamic Dental Solutions, Inc. ("Dynamic") whereby Dynamic would act as a sales representative for Archer Dental for various equipment lines which Archer Dental was authorized to sell. Archer Dental was billed by Danaher for the equipment Dynamic sold on Archer Dental's behalf, and Archer Dental paid Danaher for that equipment. Archer Dental had financial responsibility for the equipment that Dynamic sold on Archer Dental's behalf. Dynamic received a percentage of the sales that it made on behalf of Archer Dental. Importantly, Archer Dental itself continued to make sales in significant volumes directly into Oklahoma and Northwest Arkansas after Dynamic became its sales representative.

25.     At the time Archer Dental entered into its arrangement with Dynamic, Archer was an authorized dealer of several dental equipment manufacturers including Pelton & Crane, Marus, DCI, DentalEZ and others. Marus and others recognized Dynamic as an authorized branch location of Archer Dental.

26.     As Archer Dental's sales agent, Dynamic practiced the same high-quality-service, low-price philosophy practiced by Archer Dental. As a result, Dynamic's sales grew significantly in its first few years after its business arrangement with Archer Dental. While

8

Dynamic's sales were growing, Schein and Company X were engaged in a price-fixing conspiracy and an agreement not to competitively bid against each other. Once Dynamic's annual sales of equipment for lines such as Pelton & Crane reached almost a million dollars, Schein and Company X began to take notice and they were not happy as those sales were cutting into their anticompetitive, fixed margins. Initially, Schein and Company X merely complained to the equipment manufacturers, such as Danaher, about Dynamic's competitive pricing. As Dynamic's sales continued to grow, however, Schein and Company X escalated their attack on Archer Dental.

27.     In September 2007, Dynamic applied to membership in the American Dental Cooperative, Inc. ("ADC") (now known as "NDC Dental"), a cooperative organization created to assist smaller, independent companies compete against large national companies. ADC membership is vital to the ability of smaller, independent dealers to obtain access to various lines of dental product and equipment lines that these dealers could not otherwise obtain. Dynamic's membership application to ADC was accepted and the membership acceptance confirmed in December 2007 by a verbal confirmation from ADC to Dynamic and by ADC's providing to Dynamic a complete set of confidential, exclusive ADC price sheet for items that ADC makes available to its members.

28.     In early 2008, however, before Dynamic could realize the benefits of its membership, ADC revoked Dynamic's membership on the basis of unspecified "input received." What Archer Dental discovered much later was that Dynamic's membership had been revoked because Company X's manager XGM complained to ADC about Dynamic's low prices and insisted that ADC terminate Dynamic's membership.

29.     The secret campaign to oust Dynamic from ADC membership was not the only anticompetitive activity being waged against Archer Dental and its sales agent Dynamic in

9

January 2008. Archer Dental would later learn that in January 2008, Schein's Tulsa Manager Mark Lowery threatened Danaher's Pelton & Crane representative Don Givens. Lowery told Givens that Schein – Pelton & Crane's largest distributor – would stop selling Pelton & Crane equipment if Pelton & Crane did not stop doing business with Dynamic and Archer Dental.

30. Consistent with the coordinated and conspiratorial scheme between Company X and Schein, in January 2008, Company X's manager XGM made the same threat to Don Givens and also to other dental equipment manufacturers such as Belmont Equipment. The threats from Schein and Company X were clear – either stop selling equipment to Archer Dental and Dynamic because they are interfering with Schein's and Company X's ability to continue to obtain anticompetitive, fixed prices from dental professionals to whom they were selling, or Schein and Company X will stop buying equipment from Danaher and Belmont.

31. By the time Schein and Company X began their coordinated boycotting activities against Archer Dental and Dynamic, Danaher had acquired multiple lines of dental equipment that had previously been manufactured by independent companies, including Pelton & Crane, Marus and DCI. Danaher possessed, and continues to possess, a dominant position in the dental equipment market. Danaher obviously took the threats from Schein and Company X seriously. Danaher agreed to join their illegal boycott and deprive Archer Dental of the ability to distribute dental equipment it needed to compete effectively.

32. In response to the threats from Schein and Company X, in January 2008, Danaher Regional Sales Manager, Dan Bump met with Lowery of Schein and XGM of Company X to discuss Archer Dental's and Dynamic's prices and what to do about them. Bump also met with Schein's Little Rock, Arkansas branch as well. At the meetings, Danaher, Schein and Company X collectively agreed that Dynamic and Archer Dental would be cut off from selling Pelton & Crane, Marus and DCI dental equipment in Oklahoma and Northwest Arkansas. Not only was

10

Dynamic cut off from selling the various Danaher equipment lines in Oklahoma and Northwest Arkansas, but Archer Dental, which had separately been selling into those states for years, was completely banned by Danaher from selling into Oklahoma and Northwest Arkansas as well and was restricted to selling in Texas only.   With Dynamic and Archer Dental removed as competitors, Schein and Company X could continue their agreement to fix margins on dental equipment sold to dental professionals.  As the quid pro quo for terminating Dynamic and cutting back Archer Dental's direct sales to Texas, Schein and Company X promised Danaher to (1) continue to distribute Danaher dental equipment brands, and (2) "make up" the sales volume that Danaher would lose as the result of restricting Archer Dental's and Dynamic's ability to sell Pelton & Crane, Marus and DCI equipment.  In fact, in order to sufficiently make up the volume lost by restricting Archer Dental (because, on information and belief, Archer Dental had become the 5th largest Pelton & Crane dealer in the U.S.), Danaher secured promises for additional sales not only from Schein's Oklahoma branch managed by Lowery but also Schein's Little Rock, Arkansas branch, in addition to the promise from XGM on behalf of Company X, because it would take all three of them to make up the significant sales previously made by Archer Dental and Dynamic.  Pelton & Crane did <u>not</u> inform Archer Dental or Dynamic of the termination  and restriction decisions at the time they were agreed to by Schein, Company X and Danaher.

33.     The decision to restrict and terminate Archer Dental and Dynamic was a collective decision between and among horizontal competitors Schein and Company X and their common manufacturer Danaher.  The way in which the decision was communicated underscores that the decision was the product of collusion.   On February 25, 2008, Schein held a teleconference with its employees and announced to them that Dynamic had been terminated from selling the Pelton & Crane line of equipment and that Archer Dental had been cut back.  Over a week later, Dynamic finally received written notification that it would not longer be able

to distribute Pelton & Crane, Marus or DCI products, and Danaher Regional Sales Manager Dan Bump told Archer Dental that it could not sell past the Red River and was restricted to selling dental equipment within the State of Texas. Danaher restricted Archer Dental to Texas as part of the illegal boycott and despite Archer Dental's years of strong sales within the States of Oklahoma and Arkansas.

34.     During the Oklahoma Dental Association meeting on May 17, 2008, Skip Pettus of Dynamic was walking down an aisle at the meeting and ran into XGM of Company X and Ron Fernandez of Schein who were involved in a conversation. XGM told Pettus that the three of them should sit down and talk. Then XGM said to Pettus, "You have got to raise your prices!" Then Mark Lowery of Schein walked up and joined the conversation. Lowery and XGM proceeded to explain Schein's and Company X's ongoing price-fixing agreement to Pettus and invited him to join it on behalf of Dynamic and Archer Dental.

35.     Disturbed by the content of the May 17, 2008 meeting, Archer Dental set out to determine what had really been happening in the dental equipment industry. What it would learn and be told by participants in the cartel would disturb Archer Dental even more.

36.     On May 27, 2008, at the request of Archer Dental, Skip Pettus met with Company X manager XGM to investigate Archer Dental's concerns that anticompetitive conduct – conduct directed at Archer Dental and all purchasers of dental equipment – was occurring and that the ringleaders were Schein and Company X.

37.     During the meeting with XGM, he described the "trust" relationship between Schein and Company X – an unusual adjective to describe the relationship between two companies that publicly present themselves to their customers as competitors. XGM explained that Company X will not compete with Schein in situations in which Company X knows that Schein has already begun talking with a dental professional to sell dental equipment. XGM will

12

simply tell the dental professional that they should buy their equipment from Schein. As XGM described it, his counterpart at Schein "knows that I'm not going to go behind his back and try to get that customer." When a dental professional asks Company X to provide a price on an item that Schein has already offered to sell that customer, Company X simply tells the dental professional, "I want you to buy [the items] from Ron [a Schein salesman]."

38. XGM, like his counterpart at Schein, explained to Pettus that he wanted to be "on the same playing field" with his competitors. In an effort to facilitate bringing Archer Dental into their unlawful agreements, XGM even offered to contact his counterparts at Schein to encourage a meeting with Pettus.

39. On June 2, 2008, Pettus met with Schein manager Mark Lowery. That meeting was even more revealing about the ongoing anticompetitive agreements between Schein and Company X . Echoing almost the identical words of XGM, Lowery remarked to Pettus: "I think when everyone plays on the same playing field, it makes things a whole lot easier." Lowery explained that he "like[s] [XGM]" and considers [XGM] a "good competitor."

40. Lowery explained in great detail how Schein and Company X enforce their unlawful agreements and stay on that same "playing field." Lowery explained that if Schein is talking to a customer and that customer calls Company X to check a price, Company X manager XGM "step[s] out of it . . . [he's] not going to bid it" because Company X "wants to maintain a certain [gross profit]." Similarly, if Schein receives a request for price from a customer, in the interest of "keeping the integrity of margins," (*i.e.*, the conspirators' code phrase for keeping prices artificially high), Schein is "not going to talk about price" because Schein does not want to be "slugging it out [with competition] and killing each other on margins." Under the Schein-Company X agreement, as Lowery put it, "[T]he doctor gets it for the same price no matter who they buy it from."

13

41.     Schein and Company X enforce their unlawful agreement by staying in close contact.  When there are "issues [as in someone charging too low a margin]," Lowery and XGM call each other and ask "what's going on?"  Lowery confessed, "I have no problem calling [XGM] up and going what the hell are you doing, [XGM]?  Are you trying to screw me over here?"  As an example, Lowery admitted that he called XGM about a dentist in Tahlequah, Oklahoma because the dentist had previously bought from Schein, and Company X's sale of an item to this dentist violated the illegal non-competition agreement between the two companies.

42.     Lowery also explained to Pettus how Schein and Company X have brought manufacturers, including Danaher, into the fold by utilizing the manufacturer representatives to enforce the margin-fixing agreement in two ways: (1) agreeing with the manufacturers that they give all dealers the same deal so that all the dealers are "on the same playing field" and (2) terminating or restricting competing dealers who refuse to play on the same field and sell at the same high prices at which Schein and Company X agree with each other to sell.

43.     In their meeting, Lowery made it clear to Pettus that the only way that Schein would leave Archer Dental's Oklahoma branch alone and cease the boycotting agreement was for Archer Dental's Oklahoma branch to "play on the same field."  In other words, so long as Dynamic maintained margins high, Lowery "[doesn't] care."  He just wanted his competitors to "have the same goal in mind."  Lowery bragged that he "knows [XGM].  You guys [Dynamic] are the unknown."  He expressed concern that Dynamic will "give away margin" whereas Company X will not.  He even went so far as to gloat that he thinks it is "terrific" when Company X gets "full boat [*i.e.*, profit margin that is in excess of 32%]" on a sale; he's "happy" with that.

44.     Acknowledging the need to keep the price-fixing agreement secret, Lowery instructed Pettus to "make it invisible with the customer because we don't want to compromise

that end of it and make it look like we are . . . having a big conspiracy going on…"  Lowery observed that if Dynamic offered a price based on its usual margin percentage and Schein offered a price based on its usual margin percentage (a percentage significantly higher than Dynamic's), it just made the higher priced company "look like you're really trying to gouge the doctor."  That does not happen, however, when competitors are adhering to the unlawful agreement.  Because of the anticompetitive agreements with competitors, Lowery boasted that he can give a customer a price "with confidence" and tell them to "go ahead" and do a price check because he secretly knows that the customer will <u>not</u> be offered a lower price by a competitor.

45.    Lowery complained to Pettus that had Dynamic not made Schein "look stupid" by offering lower prices and had Dynamic been "upon the level playing field" [charging the same high prices as Schein] then everything would have been "hunky dory."  Schein and Company X would not have complained to Pelton & Crane, would not have entered into an agreement to cut off Dynamic, and Dynamic would still have the Pelton & Crane line today.

### Schein, Company X and Danaher Agree to
### Restrict Archer Dental's Instrumentarium Distribution

46.    During the time that the sales of Archer Dental's Oklahoma branch were growing exponentially, it was agreed in September 2007 during the American Dental Association meeting with Instrumentarium management, John Franz and Mike Null, that Archer Dental would be the first hybrid, national dealer of Instrumentarium dental imaging equipment.  A hybrid dealer is one that sells nationally from a single location with no geographic restrictions, in contrast to the limited geographic territories that may be placed on other dealers.  The announcement of Archer Dental's new status as the first national hybrid dealer was made by Instrumentarium management to all Instrumentarium sales representatives equipment at the Instrumentarium national sales meeting in 2007.  The appointment of Archer Dental as Instrumentarium's first national hybrid dealer was a significant achievement for Archer Dental.  As an independent,

15

family-owned business in Plano, Texas, it had established the type of reputation that enabled it to be permitted to sell the cutting-edge, high-end dental imaging equipment made by Instrumentarium, throughout the U.S. – a distinction no other small, independent dealer had been given.

47.     Archer Dental quickly demonstrated why it had received the national hybrid dealer appointment.  Archer Dental experienced significant sales increases of Instrumentarium equipment.  In fact, Archer Dental experienced 90% sales growth each year in the two years it was a national Instrumentarium distributor.

48.     With the sales growth of Instrumentarium equipment by Archer Dental, it became obvious to Schein and Company X that they were continuing to lose business to Archer Dental. Due to its competitive pricing of Instrumentarium equipment, Schein's and Company X's price-fixing agreement was threatened.  Schein and Company X therefore decided to widen their anticompetitive campaign against Archer Dental to restrict further its distribution territory and decrease competition.

49.     They initially began complaining to Instrumentarium about Archer Dental's pricing.  But as with their tactics in Oklahoma, Schein and Company X escalated the threats, telling Instrumentarium that they would not sell Instrumentarium products unless Instrumentarium boycotted Archer Dental.

50.     Once again, Danaher, through its predecessor Instrumentarium, decided to join the conspiracy rather than exercise independent business judgment.  Instrumentarium gave Company X and Schein veto power over Archer Dental's sales.  For example, in October 2008, Archer Dental was directed to "back off" by the Director of Sales for Instrumentarium from a sale to a dentist in the State of Washington because Company X had been working with this dentist and Instrumentarium could not allow the dentist to insist on getting a "lower price out of

16

a local dealer." In other words, Instrumentarium prohibited Archer Dental from making a sale of Instrumentarium equipment in order to force the dentist to pay Company X's higher price for dental equipment. In March of 2009, at Schein's behest this time, Archer Dental was again prohibited by Instrumentarium from making a sale to a dentist in California. These were not isolated incidents. As the Director of Sales of Instrumentarium, Mike Null, explained to Archer Dental, "This is Schein's backyard and Schein is raising hell about your current pricing…." The anticompetitive conduct directed at Archer Dental was undertaken with full awareness and approval at Schein headquarters. Null admitted to Archer Dental, "You can't believe what an issue you've become at Schein corporate."

51.    Ultimately, Schein and Company X informed Instrumentarium representatives that they could not even set foot in Schein and Company X showrooms and Schein and Company X threatened that they would not sell Instrumentarium equipment until Instrumentarium terminated Archer Dental's ability to distribute Instrumentarium equipment on a national basis. And that is precisely what Instrumentarium, in consort with Schein and Company X did, by letter dated April 2, 2009. Using language suspiciously similar to Schein manager Lowery's references to "margin integrity," Instrumentarium stated that it was reducing Archer Dental's distribution territory from national distribution to the State of Texas in part because of "the integrity of its end-user pricing." In one fell swoop, Archer Dental went from selling over $1.2 million of Instrumentarium equipment in 2009 to $100,000 in 2011. And dentists outside of Texas lost their competitive alternative and instead have been forced to pay prices fixed by agreement between Schein and Company X, all with the knowledge and complicity of Danaher.

52.    On information and belief, Defendants' and Company X's conspiracy is continuing and injury to Archer Dental from that conspiracy is continuing. Indeed, as recently as May 2012, Danaher management has threatened Archer Dental that if it "steals" (*i.e.,* competes

with and/or offers a better price to a dentist than Schein or other horizontal competitors), Archer Dental will be terminated from selling Danaher equipment.

## CONCEALMENT AND TOLLING

53.    Throughout the relevant period, Defendants and Company X have affirmatively concealed from Plaintiff the unlawful combination, conspiracy and agreement among them alleged in this Complaint.  Defendants and Company X have conducted their conspiracy in secret.  Upon information and belief, Defendants and Company X planned and implemented the conspiracy during non-public meetings, monitored and enforced the conspiracy in non-public meetings, agreed not to discuss or disclose the details of their conspiracy, falsely represented to Plaintiff that the reasons for the actions taken by Danaher with respect to Plaintiff's distribution rights were unilateral and based on legitimate business reasons, and falsely represented to customers that the prices they paid for dental equipment were fair and competitive.

54.    As a result of Defendants' and Company X's concealment, any applicable statute of limitations affecting the rights of Plaintiff has been tolled.  Plaintiffs exercised due diligence to learn of their legal rights, and, despite the exercise of due diligence, did not discover and could not have discovered the unlawful conduct alleged herein at the time it occurred.  Any applicable statute of limitations has also been tolled by agreement.

## COUNT ONE
## SHERMAN ACT SECTION 1 VIOLATION AGAINST ALL DEFENDANTS

55.    Plaintiff incorporates by reference paragraphs 1 through 54 as if fully alleged herein.

56.    At all times relevant to the Complaint, Defendants and Company X have combined and conspired to eliminate competition for the sale of dental equipment and to maintain margins on the sale of such equipment at anticompetitive levels.  In furtherance of their conspiracy, Defendants and Company X have agreed not to compete, agreed not to provide price

18

quotes to dentists who request them and agreed to fix margins on equipment prices. In furtherance of their conspiracies and illegal agreements, Schein and Company X agreed with Danaher (and its predecessor companies) to boycott, terminate and/or restrict Archer Dental's distribution territories.

57. These agreements are *per se* violations of Section 1 of the Sherman Act. More specifically, elimination, by joint collaborative action, of discounters from access to the market is a *per se* violation of the Sherman Act. The participation in the agreement by Danaher, the common supplier to Defendants, Company X and Plaintiff, does not change the character of the conspiracy. Indeed, a conspiracy is horizontal in nature when a number of competitor firms agree with each other and at least one of their common suppliers or manufacturers to eliminate their price-cutting competition by cutting his access to supplies.

58. The agreements that Defendants and Company X have entered, maintained, renewed and enforced with one another have had the purpose and effect of eliminating competition for the sale of dental equipment by and among dealers of dental equipment and maintaining prices for such equipment above competitive levels. Furthermore, as the result of Defendants' and Company X's conduct, all dentists have been deprived of the competition offered by Archer Dental and have overpaid for dental equipment.

59. As a direct and proximate result of Defendants' and Company X's past and continuing violations of Section 1 of the Sherman Act, Plaintiff has suffered injury and damages in an amount to be proved at trial.

60. Plaintiff seeks money damages from Defendants jointly and severally for these violations. These actual damages should be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15.

DAL:842239.2

61.     Plaintiff also seeks injunctive relief.  The violations set forth above are continuing and will continue unless injunctive relief is granted.

## COUNT TWO
## VIOLATION OF TFEAA AGAINST ALL DEFENDANTS

62.     Plaintiff incorporates by reference paragraphs 1 through 54 as if fully alleged herein.

63.     At all times relevant to the Complaint, Defendants and Company X have combined and conspired to eliminate competition for the sale of dental equipment and to maintain margins on the sale of such equipment at anticompetitive levels.  In furtherance of their conspiracy, Defendants and Company X have agreed not to compete, agreed not to provide price quotes to dentists who request them and agreed to fix margins on equipment prices.  Defendants and Company X have enforced this agreement in part by agreeing with Danaher (and its predecessor companies) to boycott, terminate and/or restrict Archer Dental's distribution territories.  The result of that illegal *per se* boycott has been to eliminate or restrict Archer Dental's ability to distribute and sell Danaher lines of dental equipment to dental professionals in Texas.  For example, as explained above, Danaher management has prohibited Archer Dental (which Danaher restricted to selling in the State of Texas as the result of the illegal conspiracy and boycott described above) from competing with Schein or other horizontal competitors in the State of Texas on threat of termination.  As a result, Archer Dental is harmed and Texas dental professionals are denied the benefit of competition.

64.     These agreements are *per se* violations of Texas Free Enterprise and Antitrust Act ("TFEAA").  More specifically, elimination, by joint collaborative action, of discounters from access to the market is a *per se* violation of the TFEAA.  The participation in the agreement by Danaher, the common supplier to both Defendants and Plaintiff, does not change the character of the conspiracy.  Indeed, a conspiracy is horizontal in nature when a number of competitor firms

DAL:842239.2

agree with each other and at least one of their common suppliers or manufacturers to eliminate their price-cutting competition by cutting his access to supplies.

65.     The agreements that Defendants and Company X have entered, maintained, renewed and enforced with one another have had the purpose and effect of eliminating competition for the sale of dental equipment by and among dealers of dental equipment and maintaining prices for such equipment above competitive levels.  Furthermore, as the result of Defendants' and Company X's conduct, dentists in Texas have been deprived of the competition offered by Archer Dental and have overpaid for dental equipment.

66.     As a direct and proximate result of Defendants' and Company X's past and continuing violations of the TFEAA, Plaintiff has suffered injury and damages in an amount to be proved at trial.

67.     Plaintiff seeks money damages from Defendants jointly and severally for these violations.  Defendants' and Company X's violations were willful and flagrant.  Plaintiff's actual damages should therefore be trebled under Section 15.21 of the TFEAA.

68.     Plaintiff also seeks injunctive relief.  The violations set forth above are continuing and will continue unless injunctive relief is granted.

69.     As required by Section 15.21(c) of the TFEAA, a copy of this Complaint, shall be mailed to the Attorney General of Texas.

### **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury pursuant to FED. R. CIV. P. 38(b) of all issues triable of right by jury.

DAL:842239.2

## PRAYER FOR RELIEF

Therefore, Plaintiff demands judgment as follows:

a. Adjudge and declare that Defendants have engaged in unlawful conduct in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

b. Adjudge and declare that Defendants have engaged in unlawful conduct in violation of Section 15.05(a) of the TFEAA, TEX. BUS & COMM. CODE, § 15.05(a);

c. Preliminarily and permanently enjoin Defendants from violating Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 15.05(a) of the TFEAA, TEX. BUS & COMM. CODE, § 15.05(a);

d. Against all Defendants, jointly and severally, award Plaintiff damages in an amount to be proved at trial, to be trebled with interest and the costs of this suit, including attorney's fees; and

e. Award such other further relief as the Court deems just and proper.

DATED: August 31, 2012

Respectfully submitted,

*/s/ Jerry L. Beane*

Jerry L. Beane
State Bar No. 01966000
jerrybeane@andrewskurth.com
Kay Lynn Brumbaugh
State Bar No. 00785152
kaylynnbrumbaugh@andrewskurth.com
ANDREWS KURTH LLP
1717 Main Street, Suite 3700
Dallas, Texas 75201
214.659.4400 Telephone
214.659.4401 Facsimile

**ATTORNEYS FOR PLAINTIFF
ARCHER AND WHITE SALES, INC.**

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Archer and White Sales, Inc.

**DEFENDANTS**

Henry Schein, Inc., Danaher Corporation, Instrumentarium Dental Inc., Dental Equipment LLC, KaVo Dental Technologies, LLC and Dental Imaging Technologies, Corporation

**(b)** County of Residence of First Listed Plaintiff    Collin County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Suffolk County
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Jerry L. Beane and Kay Lynn Brumbaugh
Andrews Kurth LLP, 1717 Main Street, Suite 3700, Dallas, TX 75201

Attorneys *(If Known)*
Martha E. Gifford, 137 Montague St., #220, Brooklyn, NY 11201 [Schein]; Steve Kuney, Williams & Connolly LLP, 725 Twelfth St., N.W., Washington, D.C. 20005 [Danaher]

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government Plaintiff
- ☒ 3   Federal Question *(U.S. Government Not a Party)*
- ☐ 2   U.S. Government Defendant
- ☐ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical |  |  | ☒ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability |  | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability |  | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine |  |  | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Med. Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise |  |  | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
|  |  |  | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** |  |  | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence |  | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | **Habeas Corpus:** |  | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 530 General |  | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 535 Death Penalty |  |  |  |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | **IMMIGRATION** |  |  |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 462 Naturalization Application |  |  |
|  | ☐ 448 Education | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition) |  |  |
|  |  | ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 465 Other Immigration Actions |  |  |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1   Original Proceeding
- ☐ 2   Removed from State Court
- ☐ 3   Remanded from Appellate Court
- ☐ 4   Reinstated or Reopened
- ☐ 5   Transferred from another district *(specify)*
- ☐ 6   Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Section 1 of the Sherman Act, 15 U.S.C. §1

Brief description of cause:
Antitrust conspiracy to eliminate competition in the sale of dental equipment.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE    08/31/2012

SIGNATURE OF ATTORNEY OF RECORD    /s/ Jerry L. Beane

**FOR OFFICE USE ONLY**

RECEIPT #  _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____